## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | |
|---|---|
| ANTONIO RICHARDSON, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )    Case No. 2:20-cv-02820-JTF-atc |
| | ) |
| KEVIN GENOVESE, | ) |
| | ) |
| Respondent. | ) |
| | ) |

## ORDER MODIFYING THE DOCKET, DENYING PETITION PURSUANT TO 28 U.S.C. § 2254, DENYING A CERTIFICATE OF APPEALABILITY, CERTIFYING THAT AN APPEAL WOULD NOT BE TAKEN IN GOOD FAITH, AND DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

Before the Court are the Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (the "§ 2254 Petition"), filed by Petitioner Antonio Richardson, Tennessee Department of Correction ("TDOC") prisoner number 561686, an inmate incarcerated at the Northwest Correctional Complex ("NWCX") in Tiptonville, Tennessee, and Respondent's Answer to Petition for A Writ of Habeas Corpus ("Answer").[1]  (ECF Nos. 1 & 8).   For the reasons stated below, the Court **DENIES** the § 2254 Petition.

---

[1] *See* Tennessee Department of Correction, Felony Offender Information, Search - Tennessee Felony Offender Information (tn.gov) (last accessed Aug. 29, 2024).   The proper respondent to a habeas petition is the petitioner's custodian NWCX Warden Brandon Watwood. *Rumsfeld v. Padilla*, 542 U.S. 426, 434-435 (2004).   *See* Northwest Correctional Complex (tn.gov) (last accessed Aug. 29, 2024).   The Clerk shall record the respondent as NWCX Warden Brandon Watwood and shall terminate all references to Kevin Genovese as the respondent.   *See* Fed. R. Civ. P. 25(d).

## I.    STATE COURT PROCEDURAL HISTORY

On August 26, 2014, a grand jury in Shelby County, Tennessee returned an indictment charging Petitioner with the first-degree premeditated murder of Andrew Wooten, in violation of Tenn. Code Ann. § 39-13-202.   (ECF No. 7-1 at PageID 71.)   On January 7, 2016, the jury returned a guilty verdict on the first-degree murder charge.   (*Id.* at PageID 104.)   The court sentenced Petitioner to life imprisonment.   (*Id.* at PageID 107.)   Kamilah Turner and Jennifer Case represented Petitioner at trial.   (*See* ECF No. 7-4 at PageID 317.)

On February 10, 2016, Petitioner filed a notice of appeal.   (ECF No. 7-1 at PageID 109.) Petitioner argued that: (1) the evidence was insufficient to sustain the first-degree murder conviction because the killing resulted from a state of passion produced by adequate provocation sufficient to lead a reasonable man to act in an irrational manner; and (2) the trial court erred in allowing a gruesome photo of the victim, Wooten, to be entered into evidence.   (ECF No. 7-8 at PageID 753-62.)   On February 13, 2017, the Tennessee Court of Criminal Appeals ("TCCA") affirmed the trial court.   (ECF No. 7-10.)   *See State v. Richardson*, No. W2016-00340-CCA-R3-CD, 2017 WL 571520 (Tenn. Crim. App. Feb. 13, 2017).   On April 13, 2017, the Tennessee Supreme Court ("TSC") denied the application for permission to appeal.   (ECF No. 7-13.)

On September 1, 2017, Petitioner filed a *pro se* Petition for Post Conviction Relief in the Shelby County Criminal Court.   (ECF No. 7-14 at PageID 837-46.)   Petitioner, through counsel Jessica Gillentine, filed an amended petition which incorporated the *pro se* petition on June 6, 2018.   (*Id.* at PageID 848-50.)   The post-conviction court held an evidentiary hearing on January 24, 2019 and denied relief the same day.   (*See* ECF Nos. 7-14 at PageID 853 & 7-16.)

2

On February 25, 2019, Petitioner appealed.  (*Id.* at PageID 856.)  He presented three issues for review: (1) whether his trial counsel performed unreasonably in failing to obtain or secure funding for an independent expert to testify at trial about Petitioner's mental health; (2) whether the post-conviction court erred in denying him funding for an independent mental health expert; and (3) whether Tenn. Sup. Ct. R. 13 violates the Tennessee and United States Constitutions.[2]  (ECF No. 7-17 at PageID 1049, 1061.)  Petitioner argued that the post-conviction trial court erred by not granting relief for ineffective assistance of trial counsel for failing to "pursue all reasonable avenues of defense relating to Petitioner's mental illness"; "gather and assess relevant records"; seeking an independent evaluation; and obtaining funding for an independent expert to use diminished capacity to prove Petitioner did not have the requisite *mens rea* for first-degree murder.  (*Id.* at PageID 1055-58.)

On November 26, 2019, the TCCA affirmed.  *See Richardson v. State*, No. W2019-00368-CCA-R3-PC, 2019 WL 6341045 (Tenn. Crim. App. Nov. 26, 2019) (ECF No. 7-19).  The TSC denied permission to appeal on April 17, 2020.  (*See* ECF No. 7-21.)

## II.    THE EVIDENCE

On direct appeal, the Tennessee Court of Criminal Appeals summarized the evidence presented at trial as follows:

> This case arises from an August 16, 2014 shooting in which Andrew Wooten, also known as Woo, sustained multiple gunshot wounds while inside his car and died as a result of his injuries.  At the trial, Teresa Wooten, the victim's sister, testified that she last saw the victim two days before the shooting.  She said that she had never heard of the Defendant before the victim's death but said her daughter and

---

[2] Tenn. Sup. Ct. R. 13 addresses the right to counsel and procedure for appointment of counsel including the appointment and compensation of experts.  *See* Tenn. Sup. Ct. R. 13(a)(1)(A-B, E) & (d).

the Defendant were Facebook friends around the time of the shooting. Ms. Wooten said that her daughter showed Ms. Wooten the Defendant's Facebook page. Ms. Wooten identified a photograph depicting the Defendant standing behind a black SUV and said this photograph was posted on the Defendant's Facebook page. Ms. Wooten said that she called the police after viewing the photograph and showed the photograph to police officers. Ms. Wooten stated that in 2012, the victim was accused of shooting the Defendant, although she did not witness the shooting.

Memphis Police Lieutenant Derrick Williams testified that on July 18, 2012, he investigated a shooting incident in which the Defendant was the victim. Lieutenant Williams stated that he called the Defendant and asked what occurred and that the Defendant reported a man identified as Woo "ran in his house on him." Lieutenant Williams said that the Defendant did not want to prosecute and that the file was closed. He said that although he asked the Defendant to sign a refusal to prosecute form, no form was signed.

On cross-examination, Lieutenant Williams testified that the telephone number he used to contact the Defendant was provided to him by the officer who responded to the crime scene. He agreed he had never spoken to the Defendant before the 2012 incident.

Taylor Newton testified that he worked at Thompson Court Apartments at the time of the 2014 shooting and that he was the assistant property manager tasked with security oversight. He said that security cameras were positioned on the main office building, that the cameras recorded the shooting, and that the police obtained a copy of the recording, which was received as an exhibit. On cross-examination, Mr. Newton testified that he was unsure whether an employee of the apartment complex continuously watched the security cameras.

Memphis Police Officer James Fort testified that he obtained the surveillance video recording from the apartment complex. Although the recording was played for the jury, it is not contained in the appellate record.

Laquinta Davis testified that she lived at the apartment complex on August 16, 2014. She said that at the time of the shooting, she was on her back porch watching neighborhood children play football and that she saw a black SUV drive around the area twice before stopping near her apartment. She said that she heard gunfire and that the Defendant got out of the driver's door of the SUV, ran toward another car, and continued shooting to "finish off" the victim. She said that the gun was a semi-automatic handgun. She said that she heard a two-second pause during the shooting, which she described as the time it took for the Defendant to "get close enough ... and then finish" shooting at the victim. She said that she heard about nine gunshots and that the Defendant returned to his SUV and drove away. She said that she called 9–1–1, that the dispatcher asked her to determine whether the

victim was breathing, that she walked to the car, and that the victim was not breathing.   She saw bullet holes in the victim's back and said the victim was "slumped over" to the side.

Ms. Davis identified the surveillance recording from the apartment complex and said that the recording accurately reflected her testimony.   She said that although several people walked toward the victim's car after the shooting, nobody got inside the car.   She said that she did not see any weapons in the victim's hands or inside the car and that she did not see anything to indicate shots were being fired from the victim's car.   She said that she had never seen the Defendant before the shooting and that she did not know the victim.

On cross-examination, Ms. Davis testified that she did not know any of the people who walked toward the victim's car after the shooting, that she did not know Charles Dowdy, and that she moved to the apartment complex about one month before the shooting.   She agreed that after the people walked toward the victim's car, she turned away from the victim's car and toward the main office while she spoke to the 9–1–1 dispatcher.

Laquilshay Brown testified that she had lived at the apartment complex about seven months at the time of the shooting.   She said that on the day of the shooting, she and a friend were returning to her apartment.   She said that from inside her friend's car, she heard gunshots and saw the Defendant drive past her friend's car while shooting a gun at someone.   She said the Defendant stopped shooting, got out of his black SUV, allowed her friend to drive past the area, walked toward the victim, and continued shooting.   She said that she was about ten feet from the Defendant when he allowed her friend to drive away from the area.   She said the victim was inside a car when the shooting began and was slumped over when her friend drove away.

Charles Dowdy testified that he lived at the apartment complex at the time of the shooting, that he knew the victim, and that the victim's nickname was Woo.   Mr. Dowdy said the victim came to his apartment around 2:00 or 3:00 p.m. before the shooting and stayed about twenty minutes.   Mr. Dowdy admitted the victim bought one pound of marijuana for $1,000 and left.   After he saw the victim drive away in a gold or greenish Mazda, Mr. Dowdy returned to his apartment.   Mr. Dowdy said that he stepped outside his apartment again and heard gunshots.   He said that although he did not see anyone shooting a gun, he saw a black SUV driving away. He said that he did not see the driver but that he knew the SUV belonged to the Defendant because it had been parked across the street from Mr. Dowdy's apartment previously.

Mr. Dowdy testified that he reviewed the surveillance recording and that he saw the Defendant's SUV leaving the crime scene.   He said that in the recording,

someone got out of the black SUV and walked toward the bushes.  Mr. Dowdy said the person would have been able to see vehicles leaving the parking lot from the bushes.

Mr. Dowdy testified that the victim did not have a weapon when the victim came to his apartment.  Mr. Dowdy admitted that he had been convicted of selling marijuana and that he was serving a sentence on probation at the time of the trial. He agreed he provided a police statement before receiving probation and that the prosecutor in his case had not promised leniency in exchange for his testimony in the present case.

On cross-examination, Mr. Dowdy testified that he had previous drug-related convictions and a conviction for altering, falsifying, or forging an automobile title or license plate.  He said the victim did not live where the shooting occurred, although he thought the victim lived at the apartment complex.  He said the drug transaction occurred in the victim's car.  He denied selling the victim "pills" or cocaine and placing or removing anything from the victim's pockets.  Mr. Dowdy said that after the victim drove away, he heard gunshots, that he ran, that he heard additional gunshots, that he got inside his car, that he attempted to drive away, and that he saw the victim's wrecked car.  Mr. Dowdy said that he stopped his car, got out, and walked to the victim's car.  Mr. Dowdy said that he yelled the victim's name, that he returned to his car, that he drove away, and that he returned to his apartment.

Shelva Stafford, Shelby County Clerk's Office records custodian, testified that the Defendant was the registered owner of a black Pontiac Aztec.  She identified the license plate and VIN numbers.  She agreed the last three digits of the license plate number matched the last three digits of the license plate visible in the photograph identified by Ms. Wooten.

Memphis Police Officer Brandon Westrich testified that he responded to the crime scene and that the deceased victim was slumped inside the victim's car with visible gunshot wounds.  He did not recall whether the doors on the victim's car were open but said nobody was inside the car.  He secured the scene and said he looked for cartridge casings and other evidence in the area.  He did not see any weapons inside the car but saw marijuana on the front passenger floorboard.  On cross-examination, Officer Westrich stated that he saw bystanders when he arrived at the crime scene but that nobody was "directly in the crime scene."

Chief Medical Examiner Karen Chancellor, an expert in forensic pathology, testified that the victim suffered four gunshot wounds to the left shoulder, back, and head.  She said that one of the bullets fractured the left clavicle, that a second bullet damaged the left lung and heart, causing internal bleeding, and that a third bullet damaged the left lung, liver, and spleen.  A fourth bullet struck the victim's skull,

6

causing a fracture, but did not injure the brain.   She concluded that either the second or third bullets could have caused the victim's death because of the damage to the victim's organs.   The victim's toxicology report showed the presence of marijuana.   She concluded that the cause of death was multiple gunshot wounds.

On cross-examination, Dr. Chancellor testified that at the time of the autopsy, a bag containing a green leafy substance, a bottle containing pills, one bag containing a white powder, one bag of white pills, a single $100 bill, two $10 bills, seventeen $1 bills, twenty-six $20 bills, and five $5 bills were collected from the victim's body.   She did not perform any analyses on the white pow[d]er.

Memphis Police Officer Jeffrey Garey testified that he collected evidence at the scene.   He recovered seventeen FC nine-millimeter cartridge casings. Photographs of the victim's car showed seven "circular defects" on the rear driver's side, circular defects on the front driver's door and front fender, broken and shattered front driver's and passenger-side windows, and three circular defects in the front driver's seat.   A single photograph showed the victim inside the car leaning toward the center console and front passenger seat and with three circular defects in his upper left shoulder and back.   Officer Garey said that one cartridge casing was found on the hood of the victim's car and that three casings were found in "fairly close proximity" to the car.   Officer Garey said no weapons or ammunition were found inside the victim's car.

Tipton County Sheriff's Detective Brandon Matlock testified that on September 17, 2014, he obtained a search warrant for the black Pontiac Aztec matching the license plate and VIN numbers previously identified.   Detective Matlock said that the SUV was registered to the Defendant.   Detective Matlock and Memphis Police Sergeant Gaylor and another officer searched the SUV.   A photograph of the SUV's interior showed an identification badge reflecting the Defendant's name and photograph.   Detective Matlock said other items were seized from the SUV, including a grey hooded sweatshirt and red and black work gloves.

Memphis Police Officer Michael Coburn testified that he processed the victim's car.   He said that the circular defects were possible bullet holes and that nine circular defects were found on the rear of the driver's seat and on the front passenger seat.   He said that twelve circular defects were found on the outside of the car.   He said that bullet projectiles were found on the left rear floorboard and in some clothing after it was removed from the back seat.   He identified two projectile fragments found on the right rear floorboard and inside the front right door handle.   He identified a baseball cap found inside the car with two circular defects and said broken window glass was found inside the car.   He said no cartridge casings, unfired ammunition, or weapons were found inside the car.   He attempted to obtain latent fingerprints from the car, but none were found.

Officer Coburn testified that he processed the Defendant's Pontiac Aztec, that no weapons or cartridge casings were found inside the SUV, and that no circular defects were found inside or outside the SUV.   He did not attempt to obtain latent fingerprints.

On cross-examination, Officer Coburn testified that the green leafy substance found inside the victim's car was later identified as marijuana, which weighed 455.8 grams.   He agreed he obtained one fingerprint on the bag containing the marijuana and said the fingerprint was forwarded to the latent fingerprint examiners.   On redirect examination, he agreed that the multiple circular defects found on the victim's car were possible bullet holes and that he found no similar markings on the Defendant's SUV.

Tipton County Sheriff's Deputy Jeffrey Thompson, Sr., testified that on September 16, 2014, the United States Marshals Service apprehended the Defendant in Covington.

Memphis Police Sergeant James Sewell testified that he responded to the scene of the shooting and that the victim had clear plastic sandwich bags in his pants pocket. He said the bags were commonly used to sell drugs.   He agreed he also saw an unmarked pill bottle containing several unidentified white pills.   He did not see any weapons or ammunition inside the car or on the victim's body.

Brenda Lee, apartment manager and records custodian for Thompson Court Apartments, testified on behalf of the defense that the Defendant and Anthony Williams leased an apartment on January 17, 2014.   She said Mr. Williams lived in the apartment on August 16, 2014.

Dominique Harris, the victim's niece and the Defendant's cousin, testified that in July 2012, the Defendant and the victim were in an altercation.   She said that someone "broke up" the fight inside an apartment at Hillview Village, that the victim ran upstairs, that the victim obtained a gun, and that the victim returned with a gun and shot the Defendant.   She recalled that multiple people, including children, were present and said that everyone "scattered" after the victim obtained the gun.   She said the Defendant also ran because everyone knew the victim went inside to obtain a gun.   She said that she and the Defendant ran downstairs, that the Defendant suffered a gunshot wound to the leg, and that the Defendant escaped through a bedroom window.   She said she heard the victim say, "Man, you think it's a game," just before the gun fired twice.   On cross-examination, Ms. Harris stated that she and the Defendant never spoke about the shooting and that she did not know the Defendant refused to prosecute the victim.

The Defendant testified that in 2012, the victim shot him.   The Defendant explained,

> [T]here was a stabbing that happened between Ms. Helen and my sister.   I
> came back from the basketball court and I saw that, so I knew [the victim]
> from the park and I told him about this, I told him ... what had happened.   I
> came around and I asked him what happened and what was going on and he
> stowed off on me and hit me and we got into an altercation.

The Defendant said that after the fight, the victim ran upstairs, obtained a gun,
found the Defendant, and shot him in the leg.   The Defendant said that he held up
his hands and asked the victim not to shoot him.   The Defendant said that the
victim ran away after the shooting, that "Helen's brother" was "coming back ... to
try to finish it off," and that he and Ms. Harris escaped through a window.   He said
that he obtained treatment at the hospital, that he only spoke to the police at the
scene before he left in an ambulance, and that he told the officer the victim shot
him.

The Defendant testified that he lived at the apartment complex where the shooting
in the present case occurred and that he shot the victim because he feared for his
life.   The Defendant said that on the day of the shooting, he returned home after
driving his sister to her home and saw the victim and Mr. Dowdy standing near the
Defendant's apartment.   The Defendant recalled an unrelated confrontation with
Mr. Dowdy the day before the shooting and said the incident related to his and Mr.
Dowdy's nieces.   The Defendant said he attempted to speak to Mr. Dowdy and Mr.
Dowdy's father to persuade Mr. Dowdy's father to calm Mr. Dowdy.   The
Defendant said that when he went to talk to Mr. Dowdy's father, "they [were]
already loading up, like they was fixin [sic] to get ready to come down there and
shoot up my apartment."   The Defendant said,

> So they saw my face and they say, they had knew me, so I guess they were ...
> squashing it and stuff ... for whatever reason like that.   But, you know how
> it is, [Mr. Dowdy], he will say something and he got to do something else,
> like get somebody to try to take you out, or something like that.

The Defendant said that he thought the matter was resolved but that when he saw
Mr. Dowdy and the victim the next day standing across the street from the
Defendant's apartment, he was unsure what was happening.   The Defendant said
that he drove his SUV around the area, parked, got out, and approached Mr. Dowdy
and the victim.   The Defendant said that he asked the men what was happening
and that the victim said, "If you don't get away from around here[,] I'm going to
blow [your] a— off."   The Defendant said he returned to his SUV, thinking about
the victim's shooting him previously.

The Defendant testified that he had owned the gun he used to shoot the victim since
the victim shot him two years previously.   He said that while he was sitting in his

9

SUV, he thought the men were going to shoot at him and that he needed to protect himself. He said that he backed up his SUV in the event the men attempted to shoot at him first, that he got out, and that he began shooting first because he thought the victim was going to kill him. He said he did not drive away because he lived at the apartment complex and because he was shot the last time he ran from the victim. He said he did not call the police immediately after the shooting and recalled feeling "a rage." He said he did not go to his apartment because he feared "they" would hurt him.

On cross-examination, the Defendant testified that he did not speak to Lieutenant Williams about the victim's shooting him in 2012. He said that he was upset about the victim's shooting him but that he "let it go." He denied wanting "street justice." The Defendant said that Mr. Dowdy did not live in the apartment Mr. Dowdy identified and that Mr. Dowdy did not live across the street from him. The Defendant agreed that he parked his SUV behind a bush on the day of the shooting but denied he backed up to ensure the victim could not see him coming around the building. He said he was not afraid of the victim until the victim threatened him.

The Defendant agreed that he saw the victim drive around the corner, that the Defendant began firing his gun, and that no gunshots were fired from the victim's car. He did not know whether the victim had a gun but said the victim had threatened him and was driving toward him. He did not know how many shots he fired at the victim's car and said he was "in a rage." He agreed he ran to his SUV when the shooting ended. He did not know why he did not call the police after the shooting and denied knowing the police were looking for him.

The Defendant testified that he was not "waiting to get [his] chance" because he had seen the victim numerous times since the 2012 shooting. He said he used a nine-millimeter handgun to shoot the victim and said he sold it to the original owner afterward. He agreed he denied shooting the victim until he saw the surveillance recording from the apartment complex. He said later, though, that he did not know he had shot the victim until he saw the recording and that he was shocked.

On redirect examination, the Defendant testified that he had to "get" the victim before the victim "got" him. He said that he needed to shoot the victim before the victim hurt him again. He said that he took seriously the victim's threat to "blow [the Defendant's] a— off."

*Richardson*, 2017 WL 571520, at *1–6.

10

### III.    LEGAL STANDARD

Federal courts have authority to issue habeas corpus relief for persons in state custody under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").   A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."   28 U.S.C. § 2254(a).

### A.  Exhaustion & Procedural Default

For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (internal citations omitted).   Nor is it enough to make a general appeal to a broad constitutional guarantee.   *Gray v. Netherland*, 518 U.S. 152, 163 (1996).   A federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same claim sought to be redressed in a federal habeas court to the state courts.   28 U.S.C. § 2254(b) & (c); *see Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).   The petitioner must "fairly present" each claim to all levels of state court review, up to and including the state's highest court on discretionary review, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy, *O'Sullivan v. Boerckel*, 526 U.S. 838, 847-48 (1999).   Tennessee Supreme Court Rule 39, effective June 28, 2001, eliminated the need to seek review in the Tennessee Supreme Court to "be deemed to have exhausted all available state remedies."   *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003); *see Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010) ("*Adams* not only requires the federal

11

courts to ensure that the state courts have the first opportunity to review and evaluate legal claims . . . but also mandates that the federal courts respect the duly-promulgated rule of the Tennessee Supreme Court that recognizes the law and policy-making function of that court and the court's desire not to be entangled in the business of simple error correction").

The procedural default doctrine is ancillary to the exhaustion requirement.  *See Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine).   If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977); *see Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment") (internal quotation marks and citation omitted).[3]   In general, however, "we may only treat a state court order as enforcing the procedural default rule when it unambiguously relied on that rule."   *Peoples v. Lafler*, 734 F.3d 503, 512 (6th Cir. 2013).

If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim), the claim is technically

---

[3] The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits.  *Walker*, 562 U.S. at 315.  A state rule is an "adequate" procedural ground if it is "firmly established and regularly followed." *Id.* at 316 (quoting *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009)).  "A discretionary state procedural rule . . . can serve as an adequate ground to bar federal habeas review . . . even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others."  *Id.* (quoting *Kindler*, 558 U.S. at 54.) (internal citations & quotation marks omitted).

exhausted, but procedurally barred. *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991); *see Robertson v. Fender*, No. 20-4215, 2021 WL 1978359, at *2 (6th Cir. Apr. 28, 2021).[4]

Under either scenario, a petitioner must show cause to excuse his failure to present the claim and actual prejudice stemming from the constitutional violation or, alternatively, that a failure to review the claim will result in a fundamental miscarriage of justice. *Schlup v. Delo*, 513 U.S. 298, 320-21 (1995); *Coleman*, 501 U.S. at 750. The latter showing requires a petitioner to establish that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime. *Schlup*, 513 U.S. at 321; *see House v. Bell*, 547 U.S. 518, 536-39 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

### B. Merits Review

Where a claim has been adjudicated on the merits in state court, the writ is only granted if the adjudication:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the benefit of the doubt."

---

[4] To avoid procedural default, federal law requires a federal habeas petitioner in Tennessee to present his federal claims to the Tennessee Court of Criminal Appeals. *Covington v. Mills*, 110 F. App'x 663, 665 (6th Cir. 2004).

*Pinholster*, 563 U.S at 181 (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011), and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).    Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.    *Pinholster*, 563 U.S. at 181-82, 185.

A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts."    *Williams v. Taylor*, 529 U.S. 362, 41213 (2000).[5]   An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case."    *Id.* at 413.    The state court's application of clearly established federal law must be "objectively unreasonable" for the writ to issue.    *Id.* at 409.    The writ may not issue merely because the habeas court, in its independent judgment, determines that the state court decision applied clearly established federal law erroneously or incorrectly.    *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citing *Williams*, 529 U.S. at 411).    "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."    *Harrington*, 562 U.S. at 103.

---

[5] The "contrary to" standard does not require citation of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them."    *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

As for challenges under §2254(d)(2), "when a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, . . . [t]he prisoner bears the burden of rebutting the state court's factual findings 'by clear and convincing evidence.'" *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quoting 28 U.S.C. § 2254(e)(1)). A state court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see also Rice v. Collins*, 546 U.S. 333, 341-42 (2006) ("Reasonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination."). [6] The Supreme Court has described this standard as "demanding but not insatiable" and has emphasized that "deference does not by definition preclude relief." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (internal quotation marks and alteration omitted).

## IV. RICHARDSON'S § 2254 PETITION

On November 12, 2020, Richardson filed his § 2254 Petition. (ECF No. 1.) He raises the following issues:

1. Whether the evidence was sufficient to convict him (ECF No. 1 at PageID 7-9);

---

[6] In *Wood*, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), "a petitioner must establish only that the state-court factual determination on which the decision was based was '"unreasonable,"' or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence." *Wood*, 558 U.S. at 299. The Court ultimately found it unnecessary to reach that issue, and left it open "for another day." *Id.* at 300-01, 303 (citing *Rice*, 546 U.S. at 339, in which the Court recognized that it is unsettled whether there are some factual disputes to which § 2254(e)(1) is inapplicable). In *Burt*, 571 U.S. at 18, the Supreme Court applied § 2254(e)(1)'s "clear and convincing" standard but cautioned that "[w]e have not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1), and we need not do so here."

2. Whether the trial court erred by admitting a photograph of the victim at the crime scene (*id.* at PageID 10-11);

3. Whether trial counsel was ineffective for failing to fully investigate, develop, and pursue an insanity defense ("IATC") (*id.* at PageID 12-13);

4. Whether trial counsel was ineffective for failing to interview homicide detective Fausto Frias and call him as a witness (*id.* at PageID 14-15);

5. Whether trial counsel was ineffective for failing to object to "several witnesses testimonies, for various reasons, detrimental to his defense, which were not listed on the petitioner's indictment" (*id.* at PageID 16-18);

6. Whether trial counsel was ineffective for failing to move for a mistrial because evidence produced at trial of the crime scene was admitted although the crime scene had been contaminated (*id.* at PageID 19-20); and

7. Whether trial counsel was ineffective for failing to file a motion to dismiss the indictment where the grand jury foreman's signature had been forged and the indictment was invalid and void because of other grand jury procedures (*id*. at PageID 21-23).

The Court issued an order on December 7, 2020, directing the Warden to file the state-court record and a response. (ECF No. 6.)   The Warden filed the state-court record on January 14, 2021 (ECF No. 7), and his Answer on January 21, 2021.   (ECF No. 8.)   Petitioner did not file a reply.

## V.   ANALYSIS OF PETITIONER'S CLAIMS

Respondent argues that the § 2254 Petition should be denied with prejudice because many of the claims are procedurally defaulted and lack merit given that "the one [] properly exhausted claim (the sufficiency of the evidence claim) provides no relief because Petitioner's pleadings do not satisfy the stringent requirements of 28 U.S.C. § 2254(d)."   (*See* ECF No. 8 at PageID 1132, 1141-45.)

### A. Sufficiency of the Evidence

Petitioner asserts that the evidence was insufficient to convict him of first-degree murder because premeditation was not proven at trial.   (ECF No. 1 at PageID 7.)   He cites Tenn. Code Ann. § 39-13-202(a)(1)(D) to argue that his mental state must be "carefully considered in order to determine whether [he] was sufficiently free from excitement and passion as to be capable of premeditation."   (*Id.*)   Petitioner argues that the trial court, as the thirteenth juror, conceded that there was "ample proof that shows that he was in a heat of passion."   (*Id*.)

Petitioner raised this claim on direct appeal.   The TCCA's consideration of this claim reads in pertinent part that:

> The Defendant contends that the evidence is insufficient to support his conviction. He argues that the State failed to establish that he acted with premeditation, that the evidence reflects he acted pursuant to adequate provocation based upon the previous altercation with the victim, and that his conviction should be reduced to voluntary manslaughter.   The State responds that the evidence sufficiently showed that the Defendant acted with premeditation and that he did not act pursuant to adequate provocation.   We agree with the State.

> In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."   *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).   The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521.   The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence ... are resolved by the trier of fact."   *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

> "A crime may be established by direct evidence, circumstantial evidence, or a combination of the two."   *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005).   "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

First degree murder is the unlawful, intentional, and premeditated killing of another.  T.C.A. §§ 39–13–201 (2014), 39–13–202(a)(1) (2014).  In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death.  *State v. Page*, 81 S.W.3d 781, 790–91 (Tenn. Crim. App. 2002); *see* T.C.A. § 39–11–106(a)(18) (2010) (amended 2011, 2014) (defining intentional as the conscious objective or desire to engage in the conduct or cause the result").  "It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time."  T.C.A. § 39–13–202(d) (2014).  "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing."  *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006).  As a result, the jury "may infer premeditation from the manner and circumstances of the killing."  *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *see State v. Vaughn*, 279 S.W.3d 584, 595 (Tenn. Crim. App. 2008).  Our supreme court has provided a list of factors which "tend to support the existence" of premeditation and deliberation.  *See Bland*, 958 S.W.2d at 660.  The list includes the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing.  *Id.* (citing *State v. Brown*, 836 S.W.2d 530, 541–42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1997)).

We conclude that the evidence is sufficient to support the Defendant's conviction. The evidence viewed in the light most favorable to the State reflects that on the day of the shooting, the Defendant arrived at the apartment complex in his black SUV, drove around the area twice before parking, that he got out of his SUV, that he grabbed a nine-millimeter handgun from inside his SUV, that he began shooting at the victim's car when it drove near the Defendant, that he walked toward the victim's car, that he stopped shooting to allow a car to drive past the area, and that he continued shooting until he had fired his handgun seventeen times.  The victim was driving his car when the shooting began, and he was struck four times.  The medical examiner testified that the cause of death was gunshot wounds. Photographs taken at the crime scene show the victim was shot three times in the rear shoulder and back areas.  After the shooting, the Defendant ran to his SUV and drove away.  We note that the Defendant fled the county and was apprehended approximately one month after the shooting.  The victim was unarmed, and the Defendant admitted no shots were fired from the victim's car.  The Defendant also admitted parking his SUV behind a bush and to selling the handgun used during the shooting to the original owner.  Based upon this evidence, a reasonable jury could conclude beyond a reasonable doubt that the Defendant committed first degree premeditated murder.  The jury's verdict reflects that it rejected the Defendant's testimony that he acted in an effort to defend himself or "in a rage" and any conflicts

18

in the evidence and witness credibility were resolved by the jury in favor of the State.    The evidence is sufficient to support the conviction.

Relative to the Defendant's argument that the evidence supports a finding that he acted based upon a state of passion produced by adequate provocation because he feared the victim due to the 2012 incident in which the victim shot the Defendant in the leg and because the victim threatened him on the day of the shooting, no evidence reflects that the victim's conduct on the day of the shooting in this case produced adequate provocation for the Defendant to shoot the victim seventeen times.    The victim was driving his car without regard for the Defendant, was unarmed, and did not attempt to injure or harm the Defendant. Likewise, no evidence shows that the victim created an imminent danger of death or serious bodily injury justifying the Defendant's shooting at the victim.    Any confrontation between the victim and the Defendant ended when the Defendant returned to his SUV after speaking with Mr. Dowdy and the victim.    We note that the trial court's final jury instructions reflect the court provided the jury with a voluntary manslaughter instruction as a lesser included offense of first degree murder and with a self-defense instruction, which the jury by its verdict rejected.    The Defendant is not entitled to relief on this basis.

*Richardson*, 2017 WL 571520, at *6-7.

In *Jackson v. Virginia*, 443 U.S. 307, 324 (1979), the Supreme Court held that, "in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief" if the Court finds, that "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."    A federal habeas court may not intrude on the trier of fact's role "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."    *Id.* at 319. Sufficiency of the evidence claims "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference."    *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). First, on direct appeal, the reviewing court defers to the trier of fact, and second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court."    *Id.* (internal quotation

marks omitted).   The federal habeas court may overturn the state court's rejection of such a claim, only if the state court's decision was "objectively unreasonable."   *Id.* (citation omitted).

Respondent cites the established standard for review of a sufficiency of evidence claim in *Jackson* and the Supreme Court's determination in *Coleman*, that there is a "high bar" and "two layers of judicial deference" to obtain habeas relief based on sufficiency of the evidence.   (ECF No. 8 at PageID 1141.)   Respondent argues that the claim fails because the TCCA does not unreasonably apply *Jackson*, and the record evidence of Petitioner parking his car behind a bush to conceal it, laying-in-wait for Wooten, getting out and shooting at Wooten's car when it passed, and pausing for another car to pass before continuing shooting could "undoubtedly" lead a rational juror to conclude that Petitioner acted with premeditation.   (*Id.* at PageID 1143.)   Respondent asserts that Petitioner's contention that he was not sufficiently free from excitement and passion asks the Court to substitute its judgment for that of the jury.   (*Id.* at PageID 1143-44.)

Respondent contends that Petitioner's reference to the trial court's statement about ample proof of heat of passion is taken out-of-context because the statement was made in a jury-out hearing for purposes of deciding which jury instructions would be allowed.   (*See* ECF Nos. 7-6 at PageID 700-701 & 8 at PageID 1144.)   Respondent argues that Petitioner did not make this argument on direct appeal, meaning that it is waived.   (*Id.*)

On direct appeal, the TCCA correctly cited *Jackson* as the applicable Supreme Court precedent.   *See Richardson*, 2017 WL 571520, at *6.   Next, the TCCA addressed the type of evidence needed to establish the crime and identified the elements of first-degree murder under Tennessee law, including a list of factors supporting a finding of premeditation.   *Id.*   The TCCA then summarized the relevant evidence in the light most favorable to the State, noting that: (1)

20

Petitioner fled the county and was not apprehended until a month later; (2) Wooten was unarmed; (3) Petitioner admitted that no shots were fired from Wooten's car; (4) Petitioner parked his SUV behind a bush; and (5) Petitioner sold the handgun back to its original owner. *Id.* at *7. The TCCA emphasized that "the jury's verdict reflects that it rejected Defendant's testimony that he acted in an effort to defend himself or 'in a rage.'" *Id.* The TCCA concluded that there was no evidence showing that Wooten created an imminent danger for Petitioner because Wooten "was driving his car without regard for [Petitioner], was unarmed, and did not attempt to injure or harm" Petitioner. *Id.* The TCCA further noted that the jury rejected voluntary manslaughter as a lesser included offense and the self-defense instruction. *Id.*

Based on this Court's review of the trial transcripts, the TCCA, giving deference to the jury as the trier of fact, reasonably concluded that the State presented sufficient evidence to support Petitioner's conviction. The testimony and other evidence presented at trial permitted a rational trier of fact to find Petitioner guilty of first-degree premeditated murder. Giving the two layers of deference due in analyzing this claim in habeas, the Court finds that the TCCA's decision was not contrary to or an unreasonable application of *Jackson* and that the TCCA did not base its decision on an unreasonable determination of the facts given the evidence. Petitioner's sufficiency of the evidence challenge is **DENIED**.

### B. The Photograph

Petitioner asserts that the trial court erred by admitting a photograph (Trial Exhibit 49) of the deceased victim at the crime scene. (ECF No. 1 at PageID 10.) He contends that admission of the photograph violated his Sixth and Fourteenth Amendment rights to a fair trial and due

process because the photograph was gruesome and the prejudicial effect it had on the jury outweighed its probative value.   (*Id.*)

On direct appeal, Petitioner argued, based on Tennessee Rules of Evidence 401, 402, and 403 and Tennessee case law, that the photograph was cumulative and not relevant to any issue contested at trial.   (ECF No. 7-8 at PageID 758-62.)   The TCCA evaluated Petitioner's claim on that basis and denied relief without any consideration of a federal constitutional issue.   *See Richardson*, 2017 WL 571520, at *7-9.   The TCCA concluded:

> The photograph clearly showed the victim's location inside the car after the shooting, and although the victim might have received treatment by first responders while sitting in the driver's seat of the car, no evidence reflects that the victim was removed from the car before the photograph was taken.   Ms. Davis testified that she determined that the victim was not breathing when she was talking to the 9–1–1 dispatcher, and Officer Westrich testified that the victim was deceased when he arrived at the scene.   The photograph assisted the jury in determining whether the Defendant acted with premeditation or whether he acted pursuant to adequate provocation as he contended during his trial testimony.   The photograph reflects that the victim was shot three times in the rear shoulder and upper back areas while inside his car and does not reflect the presence of a weapon, which supported witness testimony.   Likewise, the photograph was not overly gruesome, although some blood was visible, and the probative value of the photograph was not substantially outweighed by the danger of unfair prejudice.   The Defendant is not entitled to relief on this basis.

*Id.* at *9.

Respondent argues that Petitioner exhausted his claim under Tennessee law and has not fairly presented his federal habeas claim about the admission of the photograph because, on direct appeal, Petitioner did not cite any clearly established federal law, cite state law that included a federal constitutional analysis, or phrase his claim in terms of constitutional law. (ECF No. 8 at PageID 1145-46.)   Respondent asserts that the claim is procedurally defaulted and that Petitioner

has not argued cause and prejudice or that the Court's failure to consider the claim would result in a miscarriage of justice.   (*Id.* at PageID 1146.)

Claims that the state courts misapplied Tennessee evidentiary rules during the trial are not cognizable in a federal habeas petition.   *See* 28 U.S.C. § 2254(a) (a federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States"); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Wilson v. Parker*, 515 F.3d 682, 705 (6th Cir. 2008) ("[a] federal court cannot issue a writ of habeas corpus 'on the basis of a perceived error of state law'" (quoting *Pulley v. Harris*, 465 U.S. 37, 41 (1984)).

Petitioner's brief on direct appeal and the TCCA's opinion relied entirely on Tennessee evidentiary rules and case law concerning the relevance of victim and crime scene photographs. Neither Petitioner nor the TCCA addressed this purported trial error as a violation of Petitioner's rights under the United States Constitution.   Petitioner did not fairly present the photograph claim as a constitutional claim and has failed to exhaust his federal constitutional claim in state court. Because no further avenue exists for exhausting the claim as a federal constitutional claim, it is barred by procedural default.   Petitioner has presented no argument to overcome the procedural default.   The photograph claim is **DENIED**.

### C.  Ineffective Assistance of Trial Counsel

Richardson's IATC claims are controlled by the standard provided in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which require a showing that "counsel's performance was deficient" and that "the deficient performance prejudiced the defense."   To establish deficient

performance, a person challenging a conviction "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688.   A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range of reasonable professional assistance." *Id.* at 689.   The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.   "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690).

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.   "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*   "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding.   Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Richter*, 562 U.S. at 104 (internal quotation marks and citation omitted); *see id.* at 111-12 ("In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . ..   The likelihood of a different result must be substantial, not just conceivable.") (citations omitted); *Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) ("But *Strickland* does not require the State to 'rule out' [a more favorable outcome] to prevail.   Rather, *Strickland* places

the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different").

In *Martinez v. Ryan*, 566 U.S. 1, 17 (2012), the Supreme Court held that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective."  A "substantial" claim is one that has some merit.  *Id.* at 14. Subsequently, in *Trevino v. Thaler*, 569 U.S. 413, 429 (2013), the Supreme Court extended its holding in *Martinez* to states in which a "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal . . .."  The Sixth Circuit in *Sutton v. Carpenter*, 745 F.3d 787, 790 (6th Cir. 2014), held that *Martinez* and *Trevino* apply to Tennessee prisoners.

*Martinez* and *Trevino* do not allow ineffective assistance of post-conviction counsel claims to serve as cause and prejudice for the procedural default of ineffective assistance of appellate counsel claims.  *Davila v. Davis*, 582 U.S. 521, 529-30 (2017).  Further, the Supreme Court has held that, "under § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on the ineffective assistance of state postconviction counsel."  *Shinn v. Ramirez*, 596 U.S. 366, 382 (2022).

In Grounds Three through Seven of the § 2254 Petition, Petitioner raised IATC claims for failing to: (a) fully investigate, develop, and pursue an insanity defense (Ground Three, ECF No. 1 at PageID 12-13); (b) interview homicide detective Fausto Frias and call him as a witness (Ground Four, *id.* at PageID 14-15); (c) object to "several witnesses testimonies, for various

25

reasons, detrimental to his defense, which were not listed on the petitioner's indictment" (Ground Five, *id.* at PageID 16-18); (d) move for a mistrial because evidence produced at trial of the crime scene was admissible because the crime scene had been contaminated (Ground Six, *id.* at PageID 19-20); and (e) file a motion to dismiss the indictment where the grand jury foreman's signature had been forged and the indictment was invalid and void because of other grand jury procedures (Ground Seven, *id*. at PageID 21-23).

On post-conviction appeal, Petitioner presented a IATC claim about counsel's failure to pursue all reasonable avenues of a mental health defense, obtain an independent mental health expert, and request a jury instruction on diminished capacity. *See Richardson*, 2019 WL 6341045, at *11.

Respondent contends that Petitioner is not entitled to relief because each IATC ground is procedurally defaulted; Petitioner has no available state court procedure to exhaust these claims. (ECF No. 8 at PageID 1147.)   Respondent argues that Petitioner does not acknowledge the default and does not plead cause and prejudice to overcome procedural default.   (*Id.* at PageID 1147-48.) Respondent addressed *Martinez* out of an abundance of caution and contends that *Martinez* is not applicable because these IATC claims were addressed in the post-conviction trial court and the defaults occurred on post-conviction appeal.   (*Id.* at PageID 1149-56.)

### 1.  Mental Health Defenses and Instructions

On post-conviction appeal, Petitioner generally addressed mental health defenses with a focus on diminished capacity, and in Ground Three, Petitioner alleges IATC for failure to pursue an insanity defense.   The claims are similar, and the Court will examine them further to determine

whether the claim presented in the post-conviction proceedings is the same as the claim presented in this habeas case.

The IATC claim about an insanity defense was raised in the post-conviction petition and at the post-conviction hearing.   (ECF No. 7-14 at PageID 838; *see* ECF No. 7-16 at PageID 958-60, 980.)   Turner, Petitioner's trial counsel, testified that she did not have clinical support for an insanity defense and that there were some red flags about Petitioner's mental health because he had been in special education classes and had low test scores.   (*Id.* at PageID 996-97, 1000.) Turner requested that Petitioner be tested by Dr. John Worley for competency, insanity and diminished capacity and remembered that Petitioner "was presenting himself as more impaired than he actually is."   (*Id.* at PageID 998, 1009.)   Turner believed that Petitioner was exaggerating his mental health issues.   (*Id.* at PageID 998-99.)   Petitioner was tested a second time and was again found to be malingering.   (*Id.* at PageID 1009-10.)

Turner then had a different doctor, Lynn Zager, evaluate Petitioner, and both Worley and Zager concluded that Petitioner was competent and that he did not have a mental health, insanity, or diminished capacity defense.   (*Id.* at PageID 1010-11.)   Based on the evaluations, Turner did not pursue a mental health-related defense.   She explained to Petitioner what the "professionals were saying" and that there was no support for a mental health defense.   (*Id.* at PageID 1012, 1025.)   So, Turner made a strategic decision to pursue self-defense.   (*Id.* at PageID 1025-26.) The post-conviction court found that Turner "had no bases in fact to claim insanity" and did not "see where there were any errors, actually on behalf of Ms. Turner."   (*Id.* at PageID 1036-37.)

On post-conviction appeal, Petitioner mentions Turner's testimony about the insanity defense.  (ECF No. 7-17 at PageID 1053.)  However, the focus of the argument pertains to a diminished capacity defense.  (*See id.* at PageID 1055-58.)

The TCCA addressed Petitioner's IATC claims about a mental health defense generally. The TCCA summarized the relevant allegations and evidence as follows:

> The petitioner timely filed a pro se petition for post-conviction relief.  In the petition, the petitioner argued trial counsel was ineffective for pursuing a theory of self-defense rather than insanity, for failing to fully investigate an insanity defense, and for failing to obtain a mental evaluation regarding the petitioner's competency to stand trial or to support an insanity defense.  . . .

> In an amended petition filed by appointed counsel, the petitioner again argued trial counsel was ineffective for failing to secure a mental health evaluation to determine the petitioner's sanity at the time of the murder and his competency to stand trial. The petitioner, his mother, and trial counsel testified at the evidentiary hearing.

> The petitioner's mother, Josephine Smith, explained the petitioner struggles with comprehension, has a short attention span, and was diagnosed with ADHD, mental depression, bipolar disorder, and schizophrenia.  The petitioner was treated at Whitehaven Mental Health Center for these conditions, but his health records were destroyed.  Ms. Smith stated Dr. Thomas at Whitehaven Mental Health Center told her that the petitioner will "go in a rage" after which he will not remember what happened.  Though trial counsel never asked, Ms. Smith told trial counsel about the petitioner's mental health issues.

> Ms. Smith provided additional details regarding the petitioner's medical and social history, including that he received Social Security Disability benefits for "[t]he way he act out," a learning disability, and manic depression.  She also noted the petitioner made poor grades while attending special education high school classes. According to Ms. Smith, the petitioner had trouble reading and was often suspended from school for his behavior.  For example, the petitioner would get angry and throw things, but when Ms. Smith asked him about his behavior, the petitioner would not remember doing it.  Doctors prescribed medication for the petitioner but told Ms. Smith to expect this behavior.  Though Ms. Smith could not remember all of the medicines prescribed to the petitioner, she generally stated he behaved better while on medication.  Ms. Smith also did not specifically remember the petitioner scoring 90 on an IQ test or passing hearing and vision tests while in school.  Upon questioning by the post-conviction court, Ms. Smith confirmed the petitioner

maintained a driver's license, two jobs, and graduated from a special education high school program.

Regarding the petitioner's present conviction, Ms. Smith explained the petitioner did not realize or remember that he killed the victim despite the video depicting the murder. However, she acknowledged the petitioner provided detailed testimony regarding the murder during trial. Ms. Smith noted she did not want the petitioner to testify based upon his mental health conditions, but she knew the petitioner wanted to explain that he did not remember killing the victim. Ms. Smith was unaware that since being incarcerated, the petitioner has been treated for his mental health issues.

The petitioner then testified, generally stating trial counsel failed to adequately investigate his case. The petitioner complained trial counsel did not discuss the theory of self-defense with him prior to trial and further noted he did not agree with this strategy. Rather, the petitioner thought the defense's strategy would be to seek a verdict for a lesser-included offense like voluntary manslaughter or second degree murder. The petitioner was also unsatisfied with trial counsel for not pursuing an insanity defense. However, when asked what trial counsel should have done to fully investigate a defense of insanity, the petitioner offered nothing. The petitioner did not believe trial counsel researched his school or medical history, and he did not remember if trial counsel questioned him about the same during his testimony. He also did not remember undergoing any mental health evaluations or the results of the same. The petitioner denied exaggerating his mental health conditions.

*Richardson*, 2019 WL 6341045, at *6-7. Petitioner testified that he "did not remember taking any tests" with Worley or Zager and claimed "[n]obody came and talked to me about nothing." *Id.* at *8. Petitioner admitted that he received Social Security disability, but did not know why; that he had behavioral issues in school; and that he was taking Percocet for a physical injury at the time of the shooting. *Id.* He also admitted that, despite his issues, he had maintained a job and lived independently. *Id.*

Turner noted Petitioner's "mental delays," decided to incorporate mental health into the defense, and "detailed her investigation into the petitioner's social and medical history" gathering "as much information as she could about the petitioner's mental health and intellectual disability

29

as well as his school and psychological testing records." *Id.*  Initial and added testing revealed malingering.  However, Turner did not feel she could pursue a mental health defense due to the absence of medical or clinical support.  *Id.* at *8-9.

The TCCA addressed Petitioner's IATC claims concerning all potential mental health defenses, including insanity.  For that reason, Petitioner's habeas claim of IATC concerning an insanity defense was exhausted.  The TCCA cited and applied the correct Supreme Court precedent in *Strickland*, *see Richardson*, 2019 WL 6341045, at *10-11, and opined:

> Here, the petitioner argues trial counsel did not pursue "all reasonable avenues of defense relating to [his] mental illness" which prohibited trial counsel from requesting a jury instruction on diminished capacity.  The petitioner asserts an instruction on diminished capacity would have negated the mens rea requirement of first degree murder and would have led the jury to return a lesser-included verdict.  The State contends trial counsel made a strategic decision to pursue a defense of self-defense after reviewing the petitioner's school and mental health records and obtaining two mental health evaluations prior to trial.  Upon our review, we agree with the State.
>
> At the evidentiary hearing, trial counsel explained that after meeting with the petitioner and speaking with his mother, she believed he suffered from cognitive delays.  As a result, trial counsel began investigating the petitioner's school, medical, and psychological testing records in order to determine if she could pursue a defense based upon the petitioner's mental health.  Relying upon an initial investigation conducted by Gloria Shettles, trial counsel learned the petitioner had trouble with reading and comprehension and took special education classes in high school.  Trial counsel then obtained a court-ordered mental health evaluation to determine if she could gather medical evidence to support a defense based upon diminished capacity or insanity.  The initial report by Dr. Worley, however, did not support either and suggested the petitioner was exaggerating his mental health condition.  Met with this roadblock, trial counsel petitioned the trial court for a second mental health evaluation based upon her belief that the petitioner suffered from mental health issues.  However, the second mental health evaluation, performed by Dr. Zager, also did not support any defenses based upon the petitioner's mental health and further suggested the petitioner was malingering.  Absent any medical evidence to support a defense based upon the petitioner's mental health, trial counsel decided to pursue a theory of self-defense after learning the victim shot the petitioner in 2012.

> The petitioner suggests trial counsel was ineffective for failing to obtain relevant school and medical records, an independent mental health evaluation, or an independent expert to support a defense based upon his mental health.   The record, however, demonstrates trial counsel used an investigator to obtain the petitioner's school and medical records, she discussed the petitioner's mental health history with his mother, and she secured two mental health evaluations in order to identify any possible defense theories she could advance based upon the petitioner's mental health.   When trial counsel learned there was no medical evidence to support such a defense, she chose to pursue a theory of self-defense instead, believing she could reasonably argue the petitioner feared the victim based upon their history.   Nothing in the record indicates trial counsel's strategy was not sound, and simply because trial counsel's strategy was unsuccessful does not render her assistance ineffective.   *See Strickland*, 466 U.S. 689; *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).   The petitioner has failed to show how trial counsel's pre-trial efforts to pursue a defense theory based upon the petitioner's mental health constituted ineffective assistance of counsel.   *See Strickland*, 466 U.S. at 694.   The petitioner is not entitled to relief.

*See Richardson*, 2019 WL 6341045, at *11.

After two psychological evaluations and findings of malingering, there was no evidence that Petitioner suffered a mental health issue that would support an insanity or incompetency defense, or a diminished capacity instruction.   Petitioner has not presented evidence of a mental health issue that would have supported his defense.   The TCCA's decision was not contrary to or an unreasonable application of *Strickland* and was not based on an unreasonable determination of facts in light of the evidence presented.   Petitioner's IATC claim for failing to investigate and pursue an insanity defense is without merit and is **DENIED**.

## 2.  Procedurally Defaulted IATC Claims

As to the remaining IATC claims, in the post-conviction petition, Petitioner "alleged trial counsel was ineffective for failing to interview homicide detective Fausto Frias and for failing to object, for various reasons, to several of the witnesses called by the State" and "asserted trial counsel was ineffective for failing to file motions to dismiss the indictment, for a mistrial, or for a

31

judgment of acquittal." *See Richardson*, 2019 WL 6341045, at \*6. Petitioner has failed to exhaust these claims before the TCCA on post-conviction appeal, and any fault for failure to exhaust the claims would be on post-conviction appellate counsel. The *Martinez-Trevino* exception "does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial," in this case the state post-conviction petition. *See Wallace v. Sexton*, 570 F. App'x 443, 453 (6th Cir. 2014); *see West v. Carpenter*, 790 F.3d 693, 698 (6th Cir. 2015) (the " *Martinez–Trevino* exception does not extend to attorney error at post-conviction *appellate* proceedings because those proceedings are not the 'first occasion' at which an inmate could meaningfully raise an ineffective-assistance-of-trial-counsel claims").

Petitioner's IATC claims were presented in the post-conviction trial court and denied. *Martinez* is not applicable to excuse the procedural default. Petitioner makes no effort to overcome the procedural default by showing cause and prejudice or a miscarriage of justice. Petitioner's remaining IATC claims are procedurally defaulted, and therefore will be **DENIED**.

## VI.    CONCLUSION

Because the clams in the § 2254 Petition are without merit or procedurally defaulted, the Court **DENIES** the § 2254 Petition.   The § 2254 Petition is **DISMISSED WITH PREJUDICE**. Judgment shall be entered for Respondent.

## VII.    APPEAL ISSUES

Twenty-eight U.S.C. § 2253(a) requires the district court to evaluate the appealability of its decision denying a § 2254 petition and to issue a certificate of appealability ("COA") "only if the applicant has made a substantial showing of the denial of a constitutional right."   28 U.S.C. §

2253(c)(2); *see also* Fed. R. App. P. 22(b).   The COA must indicate the specific issue or issues

that satisfy the required showing. 28 U.S.C. §§ 2253(c)(2) & (3).   No § 2254 petitioner may appeal

without this certificate.   28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

A "substantial showing" is made when the movant demonstrates that "reasonable jurists

could debate whether (or, for that matter, agree that) the petition should have been resolved in a

different manner or that the issues presented were adequate to deserve encouragement to proceed

further."  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotation marks omitted).

> Where a district court has rejected a constitutional claim on the merits, the showing
> required to satisfy § 2253(c) is straightforward:   The petitioner must demonstrate
> that reasonable jurists would find the district court's assessment of the
> constitutional claims debatable or wrong. . ..   When the district court denies a
> habeas petition on procedural grounds without reaching the prisoner's underlying
> constitutional claim, a COA should issue when the prisoner shows, at least, that
> jurists of reason would find it debatable whether the petition states a valid claim of
> the denial of a constitutional right and that jurists of reason would find it debatable
> whether the district court was correct in its procedural ruling. . ..

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).   "In short, a court should not grant a certificate

without some substantial reason to think that the denial of relief might be incorrect."  *Moody v.*

*United States*, 958 F.3d 485, 488 (6th Cir. 2020).   "To put it simply, a claim does not merit a

certificate unless *every independent reason to deny the claim is reasonably debatable*."  *Id.*; *see*

*also id.* ("Again, a certificate is improper if *any* outcome-determinative issue is not reasonably

debatable.").

In this case, there can be no question that the § 2254 Petition has claims that are without

merit or procedurally defaulted.   Because any appeal by Petitioner on the issues raised in his §

2254 Petition does not deserve attention, the Court **DENIES** a certificate of appealability.

Rule 24(a)(1) of the Federal Rules of Appellate Procedure provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit.   However, if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal *in forma pauperis*, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court.   *See* Fed. R. App. P. 24(a) (4)-(5).   In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith.   It is therefore **CERTIFIED**, pursuant to Federal Rule of Appellate Procedure 24(a), that any appeal in this matter would not be taken in good faith.   Leave to appeal *in forma pauperis* is **DENIED**.[7]

**IT IS SO ORDERED,** this 23rd day of September, 2024.

*s/John T. Fowlkes, Jr.*
JOHN T. FOWLKES, JR.
United States District Judge

---

[7] If Petitioner files a notice of appeal, he must pay the full $605 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within 30 days of the date of entry of this order.   *See* Fed. R. App. P. 24(a)(5).